**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.  2:09-cr-146-RLH-GWF |
| Plaintiff, | ) | |
| | ) | **FINDINGS &** |
| vs. | ) | **RECOMMENDATIONS** |
| | ) | |
| RAASHAN COLEY, | ) | Motion to Suppress - #37 |
| | ) | Motion to Suppress - #42 |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant Raashan Coley's Motion to Suppress Statements for Fifth Amendment Violation (#37), filed on March 19, 2010; the Government's Response to Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#54), filed on May 4, 2010; Factual Correction to Government's Response to Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#56), filed on May 10, 2010; and Defendant's Reply to Government's Opposition to Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#57), filed on May 12, 2010.

Also before the Court is Defendant's Motion to Suppress for Fourth Amendment Violation (#42), filed on April 1, 2010; the Government's Corrected Response to Defendant's Motion to Suppress for Fourth Amendment Violation (#52), filed on May 4, 2010; and Defendant's Reply to Government's Response to Defendant's Motion to Suppress (#55), filed on May 10, 2010.  The Court conducted an evidentiary hearing on these motions on May 19, 2010.

**FACTUAL BACKGROUND**

On January 12, 2009, Las Vegas Metropolitan Police Officer R. Calderon-Lopez obtained a search warrant from a Nevada state court judge to search the premises located at 3825 Cambridge Avenue, Apartment 341, Las Vegas, Nevada 89119.  In her affidavit in support of the search

1   warrant, Officer Calderon-Lopez stated she met with a known confidential informant ("CI") who

2   told her that the CI had knowledge of the buying and selling of narcotics, primarily

3   methamphetamine, at the above address.  The CI informed the officer that the activity was

4   occurring at all hours of the day and night.  In order to confirm the information, the police arranged

5   to have the CI make a "controlled buy" of methamphetamine from the residence on January 11,

6   2009.  *Government's Response (#53)*, Exhibit "B," Search Warrant Application and Affidavit

7   (hereinafter "Affidavit"), p. 00194.

8           The affidavit stated that "[p]rior to the controlled buy, the CI was thoroughly searched to

9   ensure the absence of any controlled substances, monies or property, and was provided with

10  LVMPD buy money to be used solely for the purchase of illegal narcotics."  *Id.*, pp. 00194-195.

11  Officer Calderon-Lopez and three other officers surveilled the CI from a nearby location and

12  observed him walk directly upstairs to the third floor of the apartment complex and to apartment

13  number 341.  A black male adult opened the apartment door and allowed the CI to enter.  After

14  approximately one minute, the CI exited the apartment with the black male adult standing behind

15  him at the doorway.  The officers observed the CI return directly to the officer's undercover

16  vehicle.  The CI did not make contact with any persons while walking to or from the target

17  apartment.  Upon returning to the officers, the CI handed over the substance he purchased from the

18  person in apartment number 341.  The CI was again thoroughly searched by the officers and no

19  additional controlled substances, money or property was found on his person.  The substance

20  handed over by the CI was subsequently tested and confirmed to be methamphetamine.  *Id.*, at pp.

21  00194-196.

22          The affidavit further states that after returning to the officer's undercover vehicle, the CI

23  stated that the black male adult who answered the door was known to the CI.  After the CI entered

24  the apartment, the black male adult went to an "unknown bedroom and retrieved a prepackaged

25  plastic baggie containing the purported Methamphetamine and handed it to the CI in exchange for

26  LVMPD buy money."  *Id*, at p. 00196.  The CI also stated that he observed a firearm in the

27  apartment in plain view.

28  . . .

The search warrant, which stated that the affidavit was attached thereto and incorporated therein by reference, authorized the police to search the subject premises and seize the following items:

A)   Controlled substances including but not limited to Methamphetamine.

B)   The paraphernalia commonly associated with the ingestion and distribution of the controlled substance Methamphetamine, such as scales, packaging materials, and "cut", grinders, customer and source lists, recordations of purchases and sales, including "owe sheets," cellular telephones, and digital pagers reflecting transactions in the controlled substance Methamphetamine, surveillance cameras, monitors and scanners used in counter surveillance of law enforcement.

C)   Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility company receipts or addressed envelopes.

D)   US currency as evidence of the crimes alleged herein.

E)   Unknown weapons and related items.

*Government's Response (#53)*, Exhibit "B," Search Warrant, p. 189.

The affidavit in support of the search warrant listed the same items of evidence, except it described the items in paragraph "E" as  "Unknown firearms and related items, such as ammunition, holsters, magazines." *Government's Response (#53)*, Exhibit "B," Affidavit, p. 00193.  The affidavit stated that the described property "constitutes evidence which tends to demonstrate that the criminal offenses of Sales and/or Possession of Controlled Substance have been and continue to be committed in violation of Chapter 453 of the NRS." *Id.*

Prior to executing the search warrant, Officer Calderon-Lopez submitted a written request for the Metro SWAT team to execute the search warrant. *Government's Response (#53)*, Exhibit "C." The request classified the search as a "Class 3: High Risk" entry.  In the additional information box, Officer Calderon-Lopez stated that the CI had "observed in plain view a black revolver with brown wooden handle on living room table."  She further stated: "Possible suspect information: Coley, Raashawn Fatim DOB 02-15-81 BMA 5'7 135lbs, has convicted priors for (Felonies) Robbery 1st and 2nd Degree and Assault. is not in SCOPE." *Id.*

3

1    The police executed the search warrant on January 12, 2009.  Officer Calderon-Lopez

2    testified during the evidentiary hearing that prior to executing the search warrant, she was aware

3    that the suspect allegedly involved in the narcotics transactions was Defendant Raashan Coley and

4    that he had prior felony convictions which made it unlawful for him to possess firearms.  She

5    testified that a Smith & Wesson .40 caliber handgun was found in a kitchen cabinet.  A small

6    handgun was found inside a black "game" bag which was located on the floor next to the bed in the

7    master bedroom.  Another small handgun was found on the bed beneath a pillow.  Forty and

8    twenty-two caliber bullets in clear plastic bags were found in a cardboard box under the bed.

9    The officers also a found an electronic weighing scale and a dinner plate on a bookcase

10   shelf in the corner of the master bedroom.  There was residue of methamphetamine on both items.

11   A box of clear plastic sandwich bags was also on the shelf.   The officers also found an Oregon

12   vehicle certificate of title in Defendant Coley's name in the bedroom.  Near the end of the search,

13   the officers found numerous small 1" by 1" plastic bags and a few larger sandwich size bags

14   containing methamphetamine hidden inside an oven mitt that was hanging from a hook beneath a

15   kitchen cabinet.  Officer Calderon-Lopez testified that the small bag of methamphetamine that was

16   purchased by the confidential informant from the apartment on January 11, 2009 was similar to the

17   small bags found in the oven mitt.

18   Officer Calderon-Lopez testified that prior to conducting this search she received training

19   about bottles, cans or other containers that have false bottoms and concealed compartments that can

20   be used to hide controlled substances or other contraband.  These items were also discussed by

21   sergeants or other officers during briefings.  She also testified that she visited a smoke shop in Las

22   Vegas where the salesperson showed her various types of cans or containers that have hidden

23   compartments.  During the search of the subject apartment, another officer called her attention to a

24   can of "Puncture Seal Instant Tire Repair" located on the shelf in the master bedroom closet next to

25   a bottle of laundry soap.  Officer Calderon-Lopez testified that it seemed unusual that this tire

26   repair product would be located in the bedroom closet.  She and the officer observed that the

27   bottom of the can appeared to be "loose."  When they picked up the can, it appeared to be light and

28   they confirmed that the bottom of the can was loose.  They unscrewed the bottom of the can which

4

1    revealed a hidden compartment.  A paper towel was stuffed inside the compartment, but there were

2    no drugs or other contraband in the can.  Photographs of the can and the concealed compartment

3    were admitted as Hearing Exhibits "5" and "6."

4            On January 14, 2009, at 8:30 P.M., the police received information that Defendant Coley

5    was at the Greyhound Bus Station in downtown Las Vegas, Nevada.  Police officers proceeded to

6    the bus station where they found Mr. Coley and his girlfriend.  Mr. Coley was taken into custody by

7    Officer Scott Mendoza.  Officer Mendoza escorted Mr. Coley out of the bus station where he

8    turned him over to Officer Travis McMurtry.  Officer McMurtry testified that after taking custody

9    of Defendant Coley at approximately 8:45 P.M., he orally advised him of his *Miranda* rights as he

10   escorted him to the patrol vehicle to travel the short distance to the Clark County Detention Center.

11   He testified that he asked Defendant Coley if he understood his rights and Defendant responded

12   "Yeah."

13           Officer McMurtry, who had been a police officer for approximately four years at the time of

14   this arrest, testified that he advises suspects of the *Miranda* warnings by either reading them from a

15   card or reciting them from memory.  In this case, he recited the warnings from memory. Officer

16   McMurtry acknowledged on cross-examination that the Las Vegas Metropolitan Police Department

17   has a written waiver of *Miranda* rights form and that he had the form in his patrol vehicle.  He

18   testified, however, that it was and is his practice to use the waiver of rights form only if the suspect

19   is going to provide a written statement or confession.  He does not use the waiver of rights form

20   when the suspect will be giving an oral interview or statement.

21           Upon arriving at the Detention Center, Defendant Coley went part way through the booking

22   process.  Officers McMurtry and Mendoza then escorted Defendant to an interview room at

23   approximately 9:30 P.M.  Officer McMurtry and Officer Mendoza testified that Defendant did not

24   state or indicate at any time that he was unwilling to speak with officers.  Officer McMurtry began

25   interviewing Mr. Coley at 9:32 P.M.  The interview was recorded and a written transcript and

26   compact disc recording of the interview were admitted as Hearing Exhibits *"*L" and "M,"

27   respectively.

28   . . .

5

1    At the beginning of the interview, Officer McMurtry identified himself, Defendant Coley

2  and Officer Mendoza as present.  Exhibit "L,"  Transcript of Voluntary Statement (hereinafter

3  "*Coley Statement*"), p. 00249.  Defendant Coley immediately stated that he appreciated that the

4  officers let his girlfriend go.  Officer McMurtry responded by asking "Why would we do that?"

5  Defendant Coley stated he did not believe his girlfriend was present because he could observe,

6  through the window, all the officers who were involved his arrest and his girlfriend was not

7  present.  In response to this statement, Officer Mendoza stated that Defendant's girlfriend was "out

8  there."  Officer McMurtry then stated:

9    What, what happens to your girl depends on you dude, because this is
10    one of the main reasons we are talking to you because everybody
     knows that you both lived at the apartment, and both your stuff is at
     the apartment and stuff in both your names are at the apartment, and
11    the stuff that was found at the apartment is in the apartment, so right
     now one of you can be charged, two of you can be charged.  So that's
12    one of the reason we are here.  I don't want to bring her in here until I
     know.

13

14  *Coley Statement*, pp. 00249-50.

15    Defendant Coley responded to this statement by stating "I'm not really get into that because

16  I think there  . . . there's some stuff that I, I'm trying to figure out a way to get myself out of this

17  situation best as possible . . . ."  *Id.*, at 00250.  Defendant proceeded to tell the officers that he could

18  provide information about four or five people involving two homicides.  He stated that he did not

19  feel comfortable discussing the matter in the interview room because he was concerned that the

20  persons outside could hear what was being said.  *Id.*  Officer McMurtry assured him that no one

21  outside the room could hear what was being said.  *Id.*

22    Officer McMurtry then shifted the interview back to Defendant and his girlfriend by stating:

23  "We're just giving you the opportunity to step up to the plate, so your girl won't go for, (inaudible)

24  stuff too."  *Id.*, at 00250.  Officer Mendoza chimed in: "We did understand the room was in her

25  name.  Okay."  *Id.*, at 00251.  Defendant Coley responded that this was not his first rodeo, and that

26  he was not going to admit to anything because he had not seen the discovery.  Mr. Coley again

27  indicated that he was willing to discuss providing information on two killings and a robbery.  *Id.*

28  Mr. Coley indicated that he was trying to figure out what he could do to negotiate a deal because

6

1
2
3
4
5

his daughter was going to be born next month and he did not want to be in a position where he could not see his child.  Mr. Coley added that he had done time before and was incarcerated when his son was born and did not get to see him except on visiting days.  He stated that he did not want to go through that situation with his daughter and, therefore he wanted to see if he could help the officers by providing information about the third persons.  *Id.*, at 00251-252.

6
7
8
9
10
11
12
13
14

Officer McMurtry stated that he could not promise Defendant anything because a search warrant had previously been obtained and the warrant was in the system.  He stated that they would have to take any type of deal "under advisement."  *Id.*, at 00252.  Defendant Coley responded by asking what the warrant was for.  Officer McMurtry informed him that he had a bunch of warrants and that he had one out of Portland too.  Defendant Coley then asked  ". . . but what is the warrant here, you just said (inaudible)."  Officer McMurtry responded:  "All the stuff found in your apartment dude."  Defendant Coley asked what the specific charges were.  Officer McMurtry responded:  "Well, you're an ex-felon, you can't have guns, how many guns did you have in there?  That's a charge for every gun.  You figure it out."  *Id.*, at 00252.

15
16
17
18
19
20
21
22

Defendant Coley and Officer McMurtry then engaged in a back and forth exchange about the warrants and charges against him.  Officer McMurtry told Defendant that methamphetamine was found in the apartment to which Defendant responded by stating "Okay, so how do you establish that it's just me?   Officer McMurtry replied  "that's why I'm here to talk to you."  Defendant pointed out that nothing was found in his possession to which Officer McMurtry stated that "the stuff with your name was found in the apartment . . . you were leaving the apartment as SWAT's coming in."  *Id.*  Defendant Coley reiterated that "you really have to prove possession, you know."  *Id.*, at 00253.  The following exchange then occurred:

23
24

McMurtry:     Well it's your apartment.  Are you saying you didn't
                       know it was there?

25

Mr. Coley:     The apartment is not in my name is it?  Nor did I,

26

McMurtry:     But you were there right?

27

Mr. Coley:     I, (inaudible) at this apartment.

28

McMurtry:     Well, what were you doing there then?

. . .

| | | |
|---|---|---|
| Mr. Coley: | | Periodically I go there, you see what I mean.  I, I know I couldn't stay there, because the fact that you have to be on the Register List.  I'm not going to register on the list, knowing that, or am I going move there and stay there knowing that I have a warrant for abscond in Oregon. (inaudible) |
| McMurtry: | | So why do you pay the rent there then? |
| Mr. Coley: | | I don't pay rent. |
| McMurtry: | | You pay the rent. |
| Mr. Coley: | | No.  At times my girlfriend would say hey can you go down there and pay just for me cause I have to go to work? |
| McMurtry: | | So you pay the rent for her is what you're saying? |
| Mr. Coley: | | Right. |
| McMurtry: | | And all of your stuff is there, and you were there, but you don't live there is what you're telling me? |
| Mr. Coley: | | I don't live there. |
| McMurtry: | | So why was all of your stuff there, your clothes and stuff with your name on it? |
| Mr. Coley: | | She washes my clothes for me.  All my clothes were inside of a bag. |
| McMurtry: | | Okay. |
| Mr. Coley: | | And from when, when I got my stuff from somebody today, they said the whole fucken place is tore up.  But all of my, all of my clothes, except for like an old pair of jeans.  All of my clothes was out of a plastic bag. |

*Coley Statement*, pp. 00253-55.

Defendant Coley then stated that the manager of the apartments had made clear that "you can't live here if you're not on the register list."  Officer McMurtry asked Defendant if that was why he put the apartment in his girlfriend's name.  Defendant responded: "No well, I put it in her name because I knew I had a warrant out of Oregon."  He stated that he was aware that the police check the registration lists and he did not want to get picked up by the police in that manner. *Id.*, at 00255.

. . .

8

1     Mr. Coley thereafter disclosed additional information about his parole or supervision status

2   in Oregon.  Officer McMurtry then asked: "So why, why do the gun and the dope have your

3   fingerprints on it then?" *Id.* at 00256.  Defendant Coley responded to this question by asking if he

4   could see the analysis.  Officer McMurtry and Defendant engaged in a further discussion about the

5   fingerprint analysis and the police obtaining DNA testing to possibly connect Mr. Coley to the guns

6   and narcotics.  *Id.* at 00256-57.

7     Officer McMurtry then stated to Defendant:

8           I'm just giving, we're giving you a chance, like I said, to step up to
              the plate okay.  Right now, your girl's sitting out there, she don't
9           have to come in here okay?  If you tell me the stuff is yours, then it's
              yours.  If it's not, then it was everybody that was in that apartment,
10          the people we know that were in that apartment were you and your
              girl, okay?  That's how its gonna work.

11

12  *Coley Statement*, p. 00257.

13    During the remainder of the interview, Officer McMurtry repeatedly attempted to persuade

14  Defendant Coley to admit that the firearms and narcotics found in the apartment belonged to him in

15  order to spare his pregnant girlfriend from also being arrested and charged with crimes.  Defendant

16  Coley argued back and forth with the officers as to whether his girlfriend was really subject to

17  arrest, but refused to admit that he was in possession of any guns or narcotics allegedly found in the

18  apartment.  *Id.*, pp. 00257-65.

19    Defendant Coley was subsequently indicted on April 8, 2009 and charged with being a felon

20  in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), and with possession

21  of a controlled substance with intent to distribute in violation of 21 U.S.C. §841(a)(1).  Both

22  charges are based on the firearms and controlled substances that were allegedly found in the

23  apartment on January 12, 2009.  Defendant is not charged in regard to the controlled substances

24  that were allegedly purchased by the confidential informant on January 11, 2009 and which led to

25  the issuance of the search warrant.

26  . . .

27  . . .

28  . . .

1

## DISCUSSION

2

A.   **FOURTH AMENDMENT ISSUES**

3

1.   **Whether the Affidavit in Support of the Search Warrant Provided Probable Cause to Search for and Seize Firearms.**

4

5   Probable cause is a fluid concept which turns on the assessment of probabilities in particular

6   factual contexts, not readily or even usefully reduced to a neat set of legal rules.  *United States v.*

7   *Adjani*, 452 F.3d 1140, 1145 (9th Cir. 006), citing *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct.

8   2317, 76 L.Ed.2d 527 (1983).  *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) states

9   that "probable cause means 'fair probability,' not certainty or even a preponderance of the

10   evidence. . . . In short, a magistrate judge is only required to answer the 'commonsense, practical

11   question whether there is 'probable cause' to believe that contraband or evidence is located in a

12   particular place' before issuing a search warrant."  *Id.*, at 1160.   The issuing judge's determination

13   of probable cause should also be paid great deference.  *Id.*

14   The search warrant affidavit in this case provided probable cause to believe that illegal

15   controlled substances, including methamphetamine, would be found in the apartment.  Defendant

16   has not disputed this.  Defendant argues, however, that the search warrant affidavit failed to provide

17   probable cause to search for and seize firearms (or ammunition) because the affidavit contained no

18   information that Defendant, or the person who allegedly sold methamphetamine from the

19   apartment, was a convicted felon who was prohibited by Nevada and federal law from possessing

20   firearms.  Defendant also argues that 18 U.S.C. § 924(c)(1)(A), which prohibits the possession of a

21   firearms during and in relation to a drug trafficking offense, is irrelevant because the warrant was

22   issued by a Nevada state court judge in relation to an investigation conducted by state law

23   enforcement officers.  Defendant notes that there is no similar Nevada statute.[1]

24

25   [1] Defendant cites the Supreme Court's recent decision in *District of Columbia v. Heller*, 128
26   S.Ct. 2783 (2009) which held that a District of Columbia ordinance prohibiting the  possession of
27   hand guns in a private residence violated the Second Amendment.  Defendant does not argue,
28   however, that laws prohibiting felons from possessing firearms or prohibiting the possession of
     firearms in the furtherance of a drug trafficking crime are unconstitutional.  In any event, the Ninth
     Circuit has stated that *Heller* does not invalidate 8 U.S.C. §922(g)(1) which prohibits felons from

10

1    The Government points out, however, that Nevada Revised Statute (NRS) § 453.301.10

2    states that firearms in the actual or constructive possession of a person who possesses or is

3    consuming, manufacturing, transporting, selling or under the influence of controlled substances are

4    subject to forfeiture.  The Government therefore argues that the officers were authorized to seize

5    any firearms found during the search of the apartment.  In any event, because there was probable

6    cause to believe that the occupant(s) of the the apartment was engaged in drug trafficking, the

7    Government argues that the affidavit also provided probable cause to seize firearms found on the

8    premises as evidence of drug trafficking.  As the Ninth Circuit stated in *United States v. Fagan*,

9    996 F.2d 1009, 10015-16 (9th Cir. 1993):

> It is well-settled that in a trial on drug trafficking charges, firearms
> are relevant and admissible to prove the defendant's involvement in
> the drug trade and intent to distribute. *See, e.g., United States v.*
> *Gillock,* 886 F.2d 220, 222 (9th Cir.1989) (revolver found in
> defendant's bedroom closet relevant to his intent to distribute
> methamphetamine); *United States v. Savinovich,* 845 F.2d 834, 837
> (9th Cir.) ("[b]ecause guns are used in many drug transactions, it may
> reasonably be inferred that an armed possessor of drugs has
> something more in mind than mere personal use[;]" therefore, under
> Fed.R.Evid. 403, "guns seized from a defendant's residence  are
> admissible in a trial for possession of a controlled substance with
> intent to distribute") (quotation omitted), *cert. denied,* 488 U.S. 943,
> 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *United States v. Isaacs,* 708
> F.2d 1365, 1371 (9th Cir.) ("trial judge has discretion to admit
> evidence of firearms in drug trafficking cases"), *cert. denied,* 464
> U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983).

19    The Defendant argues that these cases should no longer be considered good law in light of

20    more recent Supreme Court and Ninth Circuit decisions dealing with the the exigent circumstances

21    exception to the requirement that officers "knock-and-announce" their presence before executing a

22    search warrant.  *Reply Brief (#55)*, p. 4, citing *Richards v. Wisconsin*, 520 U.S. 385, 393, 117 S.Ct.

23    1416, 1421 (1997) and *United States v. Granville*, 222 F.3d 1214, 1219 (2000).  In *Richards v.*

24    *Wisconsin*, the Court rejected an automatic exception to the knock-and-announce requirement for

_____

26    possessing firearms.  *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)  The Seventh Circuit
27    has also held that *Heller* does not invalidate 18 U.S.C. §924(c), which prohibits the  possession of
      firearms in furtherance of a drug trafficking offense.  *United States v. Jackson*, 555 F.3d 635 (7th
28    Cir. 2009)

search warrants involving drug trafficking investigations. The Court stated it is inappropriate for law enforcement to predicate decisions affecting a defendant's Fourth Amendment rights on a generalized fear about the behavior of drug dealers. While recognizing that drug trafficking investigations frequently pose special risks to officer safety and the preservation of evidence, the Court stated that not every investigation will pose these risks to such a substantial degree that the knock and announce requirement should be waived. The Court held that whether exigent circumstances exist depends on the facts and circumstances of each case. More recently, the Supreme Court has held that a violation of the "knock-and-announce" requirement does not require the suppression of evidence seized during an otherwise lawful search. *Hudson v. Michigan*, 547 U.S. 586, 594, 126 S.Ct. 2159, 2165 (2006). In so holding, the Court stated that the knock-and-announce requirement does not protect the individual's interest in preventing the government from seeing or taking the evidence described in the warrant. Rather, the purpose of the requirement is to avoid violence that may result from a mistaken belief in the need for self defense or to avoid unnecessary damage to property. *Id.*

The foregoing decisions do not reject the "well established" law that evidence of possession of firearms is admissible to prove that a defendant was engaged in drug trafficking. Whether a particular firearm or other weapon constitutes evidence of drug trafficking also depends on the circumstances in which it is found. In *United States v. Gillock*, 886 F.2d 220, 222 (1989), for example, the court held that a revolver that was found in the closet of defendant's bedroom along with five ounces of methamphetamine and filter papers was admissible as evidence to show that defendant was engaged in drug trafficking. In *United States v. Savinovich,* 845 F.2d 834, 836-7 (9th Cir. 1988), the court also affirmed the admission of evidence that firearms were found in the bedroom closet and kitchen cabinet near where other evidence of drug trafficking was also found.

Besides the information that methamphetamine was being sold from the apartment, the affidavit in this case stated that the confidential informant had observed a firearm in the apartment in plain view. This was sufficient to provide probable cause to search for firearms as evidence of the suspected drug trafficking operation. During the ensuing search, the officers found a handgun in a kitchen cabinet near where numerous bags of methamphetamine were concealed in the oven

1    mitt.  Two other handguns and bullets were found in the bedroom where the officers also found

2    evidence indicating that methamphetamine was being separated, weighed and packaged by the

3    occupant.  These circumstances provided reasonable grounds to seize the firearms and ammunition

4    as evidence that the person or persons who occupied the apartment were engaged in drug

5    trafficking.

6       **2.    Whether the Warrant Described the Items to Be Seized With Sufficient Particularity.**

7

8         Defendant also argues that evidence seized during the search should be suppressed because

9    the warrant did not describe the items to be seized with sufficient particularity.  The warrant

10   authorized the seizure of controlled substances, including methamphetamine, drug paraphernalia,

11   limited items of personal property, such as identification documents or utility payment bills which

12   would establish possession of the items seized, U.S. currency, and "Unknown weapons and related

13   items."  The seized items that Defendant challenges, based on lack of particularity in the search

14   warrant, are the handguns and the can of "Puncture Seal Instant Tire Repair."

15       In *United States v. Mann*, 389 F.3d 869, 877-78 (9ᵗʰ Cir. 2004), the court discussed the

16   purpose of the particularity requirement and how it should be applied as follows:

17                The Fourth Amendment requires that a warrant particularly describe
                 both the place to be searched *and* the person or things to be seized.
18               U.S. Const. amend IV.  The description must be specific enough to
                 enable the person conducting the search reasonably to identify the
19               things authorized to be seized.  *See United States v. Silva,* 247 F.3d
                 1051, 1057 (9th Cir.2001); *United States v. Spilotro,* 800 F.2d 959,
20               963 (9th Cir.1986).  This requirement prevents general, exploratory
                 searches and indiscriminate rummaging through a person's
21               belongings.  *See id.; United States v. McClintock,* 748 F.2d 1278,
                 1282 (9th Cir.1984).  It also ensures that the magistrate issuing the
22               warrant is fully apprised of the scope of the search and can thus
                 accurately determine whether the entire search is supported by
23               probable cause.  *Spilotro,* 800 F.2d at 963; *United States v. Hillyard,*
                 677 F.2d 1336, 1339 (9th Cir.1982).
24
                 The specificity required in a warrant varies depending on the
25               circumstances of the case and the type of items involved.  *Spilotro,*
                 800 F.2d at 963.  "Warrants which describe generic categories of
26               items are not necessarily invalid if a more precise description of the
                 items subject to seizure is not possible."  *Id.; see also United States*
27               *v. Cardwell,* 680 F.2d 75, 78 (9th Cir.1982).  "While a search warrant
                 must describe items to be seized with particularity sufficient to
28               prevent a general, exploratory rummaging in a person's belongings, it

1    need only be reasonably specific, rather than elaborately detailed."
      *United States v. Rude,* 88 F.3d 1538, 1551 (9th Cir.1996) (internal
2    quotation marks and citations omitted).

3    In determining whether a description is sufficiently precise, we have
      concentrated on one or more of the following: "(1) whether probable
4    cause exists to seize all items of a particular type described in the
      warrant, (2) whether the warrant sets out objective standards by
5    which executing officers can differentiate items subject to seizure
      from those which are not, and (3) whether the government was able
6    to describe the items more particularly in light of the information
      available to it at the time the warrant was issued." *Spilotro,* 800 F.2d
7    at 963 (internal citations omitted); *accord United States v. Lacy,* 119
      F.3d 742, 746 n. 7 (9th Cir.1997); *United States v. Noushfar,* 78 F.3d
8    1442, 1447 (9th Cir.1996).

9    In *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009), the court

10   further explained the particularity requirement as follow:

11   Our cases describe this requirement as one of "specificity" and we
      have distinguished its "two aspects": "particularity and breadth....
12   Particularity is the requirement that the warrant must clearly state
      what is sought.  Breadth deals with the requirement that the scope of
13   the warrant be limited by the probable cause on which the warrant is
      based." *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d
14   847, 856-57 (9th Cir. 1991) (internal citations omitted).

15   **(a)    Seizure of Handguns and Ammunition.**

16   The warrant authorized the officers to seize "Unknown weapons and related items."

17   *Government's Corrected Response to Defendant's Motion to Suppress (#53), Exhibit "B"*, p.

18   00189.  The affidavit, however, more specifically described these items as "Unknown firearms and

19   related items, such as ammunition, holsters, magazines."  *Id.*, p. 00193.  Although the Defendant

20   did not argue this point in his motion to suppress, item "E" of the search warrant was arguably

21   vague and overbroad in authorizing the seizure of any type of weapon or related items.  Because the

22   affidavit was incorporated into and attached to the warrant, however, it may be referred to in order

23   to supply particularly that may have been lacking in the warrant itself.  *See United States v. SDI*

24   *Future Health, Inc.*, 568 F.3d at 699-701.  As limited by the affidavit, the warrant authorized the

25   officers to seize firearms or related items such as ammunition for which probable cause existed.

26   The handguns which were found and seized by the officers clearly fall within the incorporated

27   affidavit's more specific description of "unknown firearms and related items, such as ammunition,

28   holsters, magazines."  Accordingly, notwithstanding the vagueness of item "E" of the warrant, the

14

handguns are not subject to suppression.  As *United States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994) states, "[t]he court need suppress . . . only those items seized pursuant to the invalid portion of a search warrant."

Defendant argues that the seized handguns should be suppressed because the officers had more specific information about the handgun that was observed by the confidential informant, but which was not included in the affidavit or the warrant.  In this regard, the confidential informant told the officers that he observed a black revolver with a brown wooden handle on the living room table.  *Government's Response (#53)*, Exhibit "C."  Defendant argues that the failure to include this information in the search warrant violated the third factor listed in *United States v. Spilatro*-- whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

While the inclusion of such detail in the affidavit would have provided greater support for the probable cause determination, it was not necessary to include this information in the warrant to satisfy the particularity requirement.  The officers did not seek a warrant to search for and seize a particular firearm.  Rather, the officers sought and obtained authorization to search for and seize firearms and related items that constitute evidence of drug trafficking.  Therefore, the  general description of unknown firearms and related items such as ammunition did not violate the particularity requirement because the officers had probable cause to seize all firearms and ammunition found in the apartment to the extent they constituted evidence of the sale or distribution of controlled substances.

      **(b)**      **Seizure of "Puncture Seal Instant Tire Repair" Can.**

Defendant also argues that the can of  "Puncture Seal Instant Tire Repair" should be suppressed because there was no probable cause to seize this item or it was not within the scope of items authorized to be seized.  The search warrant authorized the police to search for and seize "paraphernalia commonly associated with the ingestion and distribution of the controlled substance Methamphetamine, such as scales, packaging materials, and "cut", grinders, customer and source lists, recordations of purchases and sales, including "owe sheets," cellular telephones, and digital pagers reflecting transactions in the controlled substance Methamphetamine, surveillance cameras,

monitors and scanners used in counter surveillance of law enforcement." *Government's Response (#53)*, Exhibit "B."

Defendant has not asserted that the description of drug paraphernalia in item B of the search warrant was vague or overbroad.  In any event, similar descriptions of narcotics paraphernalia have been upheld against attacks that they violate the particularity requirement. *See United States v. Baldwin*, 987 F.2d 1432, 1436 (9th Cir. 1993) and *United States v. Hinds*, 856 F.2d 438, 440-41 (1st Cir. 1988).  Instead, Defendant argues that the can of "Puncture Seal Instant Tire Repair" does not fit within any of the examples of paraphernalia listed in the search warrant.  The Government argues that the can qualifies as "packaging materials."  A commonsense interpretation of "packaging materials" would include wrappers or containers such as plastic bags in which methamphetamine is sold or distributed.  An aerosol can which appears to contain a consumer product, but which instead has a hidden compartment that can be used to conceal contraband, might qualify as "packaging materials," but does not readily fit within this subcategory.  The Government alternatively argues that the can constitutes an item of personal property which would tend to establish a possessory interest in the items seized pursuant the search warrant.  This argument is even less persuasive.  As item "C" of the search warrant states, this category includes things such as identification documents, photographs, utility receipts or addressed envelopes which would connect an individual to the premises or to the *other* seized items.  The  "Puncture Seal Instant Tire Repair" can clearly does not fall within this category.

Although the can of  "Puncture Seal Instant Tire Repair" does not fit within the examples of paraphernalia listed in item B of the search warrant, it reasonably qualifies as paraphernalia commonly associated with the possession or distribution of controlled substances.  Nevada Revised Statute (NRS) §453.554 defines "drug paraphernalia" as all equipment, products and materials of any kind which are used, intended for use or designed for use in . . . storing, containing, concealing a  . . . controlled substance."  Subsection 10 of the statute states that "drug paraphernalia includes, but is not limited to "[c]ontainers and other objects used, intended for use, or designed for use in storing or concealing controlled substances."  NRS §453.556.4 further states that in determining whether an object is an item of drug paraphernalia, a court may consider all logically relevant

factors, including "the proximity of the object to controlled substances." This statutory definition provides a reasonable basis for determining what constitutes drug paraphernalia as used in the instant search warrant. A container with a hidden compartment and which is found in the same apartment and bedroom where controlled substances and other evidence of drug trafficking are found, reasonably qualifies as drug paraphernalia within the scope of the warrant, notwithstanding that such containers are not specifically listed in the warrant as examples of paraphernalia. The officers therefore were authorized by the warrant to seize the can as evidence of drug possession or drug trafficking. For this reason, the Court also rejects Defendant's argument that the officers had no reason to seize the can because it is not against the law to possess such items.

Defendant also argues that the seizure of the can of "Puncture Seal Instant Tire Repair" cannot be justified because its hidden compartment was not visible to the officers absent an actual search of the item. Because the warrant authorized the agents to search for controlled substances, however, the can's characteristics as "paraphernalia" did not have to be in plain view in order for the officers to search it. *United States v. Grandstaff*, 813 F.2d 1353, 1358 (9th Cir. 1987) states that "[i]t is axiomatic that if a warrant sufficiently describes the premises to be searched, this will justify a search of the personal effects therein . . . if those effects might contain the items described in the warrant. *United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (984)." Thus, in *Grandstaff*, a warrant which authorized the police to search a motor vehicle for evidence of an armed robbery, also authorized them to search closed luggage found in the vehicle which might contain the items listed in the warrant. In *Gomez-Soto*, a warrant, which authorized the agents to search defendant's residence for controlled substances, also authorized them to open a briefcase located in the residence in which they found cocaine.

The officers in this case were authorized to inspect and open any containers in the apartment in which controlled substances, currency or records of drug transactions might reasonably be found. Given their observations about where the can was located and that its bottom was loose, the officers clearly had reasonable cause pursuant to the warrant to inspect and search it. This case is readily distinguishable from *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149 (1987) on which Defendant relies. In *Hicks*, the police were authorized by exigent circumstances to make a

17

1   warrantless entry into an apartment to look for the person who fired shots into another apartment

2   and to also look for other victims and weapons.  After entering the apartment, an officer observed

3   expensive stereo components which he suspected might be stolen property.  The officer moved the

4   components in order to read and record their serial numbers.  It was subsequently determined that

5   the items were stolen in an armed robbery and defendant was later indicted for the armed robbery.

6   The Supreme Court held that the act of moving the components in order to see and record the serial

7   numbers constituted a search.  Because the officer did not have probable cause to search for stolen

8   property and the search of the components was unrelated to the reason for the entry, the seizure of

9   the components could not be justified under the plain view doctrine.

10          **3.    Whether the Seizure of the Firearms and "Puncture Seal Instant Tire**

11          **Repair" Can Was Alternatively Justified Under the "Plain View" Doctrine**.

12          Although the admissibility of the firearms and the can of "Puncture Seal Instant Tire

13   Repair" does not depend on the "plain view" doctrine, that doctrine provides an alternative basis

14   for their admission as an exception to the Fourth Amendment's warrant requirement.  *Arizona v.*

15   *Hicks*, 480 U.S. 321, 107 S.Ct. 1149 (1987) and *Texas v. Brown*, 460 U.S. 730, 737-39, 103 S.Ct.

16   1535, 1541-42 (1983).  Those portions of the warrant that authorized the agents to search for and

17   seize controlled substances are not invalidated by arguable deficiencies pertaining to the seizure of

18   firearms or weapons and related items.  In searching for controlled substances, the officers were

19   entitled to open the kitchen cabinet, the game bag, and to move the pillows on the bed.  In so doing,

20   the officers found the three handguns.  Upon observing the handguns, the officers had probable

21   cause to seize them as evidence of criminal activity.  First, the proximity of the firearms to other

22   controlled substances and narcotics paraphernalia justified their seizure as evidence of drug

23   trafficking.  *Fagan, supra.*  Second, the officers had information that Defendant Coley was the

24   person who sold drugs from the apartment and documents belonging to him were found in the

25   apartment.  The officers also knew that Coley was a convicted felon who was prohibited from

26   possessing firearms.  The officers also had probable cause to inspect and open the "Puncture Seal

27   Instant Tire Repair" can in their search for controlled substances.  Based on their discovery of the

28   . . .

18

1   concealed compartment, the officers had probable cause to seize the can as evidence of drug

2   possession or trafficking.

3         Based on the foregoing, the Court finds the seizure of the handguns, ammunition and can of

4   "Puncture Seal Instant Tire Repair" did not violate the probable cause or particularity requirements

5   of the Fourth Amendment.

6         **4.**    **<u>Good Faith Exception.</u>**

7         The Government argues that even if the search warrant is invalid because it lacks

8   particularity, the Court should nonetheless apply the good faith exception to the exclusionary rule

9   and decline to suppress the seized evidence. *United States v. Leon*, 468 U.S. 897, 922-23,104 S.Ct.

10   3405, 3421 (1984) holds that the exclusionary rule does not apply when the officers conducting the

11   search acted in objectively reasonable reliance on a warrant issued by a detached and neutral

12   magistrate that subsequently is determined to be invalid.  This exception does not apply if (1) the

13   magistrate was misled into issuing the warrant by information in the affidavit that the affiant knew

14   was false or would have known was false but for his reckless disregard of the truth; (2) the issuing

15   magistrate wholly abandoned his judicial role; (3) the affidavit upon which the warrant is based is

16   so lacking in the indicia of probable cause as to render official belief in its existence entirely

17   unreasonable; or (4) the warrant is so facially deficient in failing to particularize the place to be

18   searched or the things to be seized that the executing officers cannot reasonably presume it to be

19   valid.

20         To the extent that the judge who issued the warrant and this Court are incorrect in

21   concluding that probable cause existed to search for and seize firearms and ammunition, the police

22   officers were objectively reasonable in relying on the issuing judge's finding of probable cause.

23   Although the warrant was overbroad in authorizing the seizure of "unknown weapons and other

24   items," it was reasonably limited by the incorporated affidavit to firearms and related items such as

25   ammunition.  The warrant was not so facially deficient in failing to particularly describe the things

26   to be seized that no officer could have reasonably believed it to be valid.  No other grounds

27   arguably exist which would prevent application of the good faith exception to the exclusionary rule.

28   **. . .**

1

2    **B.    FIFTH AMENDMENT ISSUES**

3            Defendant Coley contends that the statements he made during the January 14, 2009

4    interview, in which he acknowledged that he sometimes paid the apartment rent and that he had

5    clothes in the apartment, should be suppressed because he was not advised of his *Miranda* rights

6    and also because the statements were obtained through psychological coercion and were not

7    voluntary.

8            **1.    Whether Defendant Was Advised of and Waived His *Miranda* Rights.**

9            In order for an inculpatory statement made by a defendant during custodial interrogation to

10   be admissible, his waiver of *Miranda* rights must be voluntary, knowing and intelligent. *United

11   States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008).  There is a presumption against waiver which the

12   Government has the burden of overcoming by a preponderance of the evidence.  *Id.*, 525 F.3d at

13   727-28. *See also United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007); *United States v.

14   Garibay*, 143 F.3d 534, 536 (9th Cir. 1998).  To meet its burden, the Government must prove that

15   under the totality of the circumstances, the defendant was aware of the nature of the rights being

16   abandoned and the consequences of such abandonment.  The Ninth Circuit has  identified several

17   factors that the district court should consider, including (i) the defendant's mental capacity, (ii)

18   whether he signed a written waiver, (iii) whether the defendant was advised of his rights in his

19   native language, (iv) whether defendant appeared to understand his rights, (v) whether the rights

20   were individually explained to him, and (vi) whether the defendant had prior experience with law

21   enforcement. *Crews*, 502 F.3d at 1140.

22           Officer McMurtry testified that he orally informed Defendant of his *Miranda* rights as he

23   escorted Defendant to his patrol vehicle following his arrest at the bus station.  He asked Defendant

24   if he understood his rights and Defendant responded "Yeah."  No other officers or persons, beside

25   Defendant, were present when the *Miranda* warnings were given.  Officer Mendoza testified,

26   however, that he asked Officer McMurtry prior to the beginning of the interview whether he had

27   advised Defendant of his rights and McMurtry told him that he had.  Officer McMurtry's reason for

28   not using the written waiver form is questionable.  He also could have easily confirmed that

     *Miranda* warnings had been given and that Defendant had waived his rights at the beginning of the

1
2
3
4
5

recorded interview.  Legitimate doubt exists where, as here, the officer did not use readily available means to document or confirm the giving and waiving of *Miranda* warnings.  There is nothing in the recorded interview, however, to suggest that the warnings were not given to Defendant.  In the absence of evidence to the contrary, Officer McMurtry's testimony that he advised the Defendant of the *Miranda* warnings is sufficiently credible to be accepted as true.

6
7
8
9
10
11
12
13
14
15
16
17
18

The Government has also met its burden by a preponderance of the evidence to show that Defendant Coley waived his right to remain silent and to consult with an attorney prior to questioning.  According to Officer McMurtry, Defendant was informed of his rights in his native language, English, and he acknowledged that he understood his rights.  Defendant Coley clearly had prior experience with the criminal justice system, including prior felony proceedings.  There is no evidence that Defendant's mental capacity was impaired.  The one factor which weighs against the finding of waiver is the absence of a written or recorded waiver of *Miranda* rights.  It appears, however, that Defendant Coley was willing to speak to the police because of his desire to negotiate a favorable deal in exchange for providing information about third persons' criminal activity.  Thus, there was a rational basis for why the Defendant would have been willing to waive his *Miranda* rights and speak with the officers.  Accordingly, the Court finds that Defendant Coley was advised of his *Miranda* rights and that he validly waived those rights prior to the commencement of the interview.

19
20

**2.   Whether Defendant's Statements During the Interview Were Voluntary or the Result of Psychological Coercion.**

21
22
23
24
25
26
27
28

Notwithstanding Defendant Coley's waiver of *Miranda* rights, the Court must also determine whether the inculpatory statements he subsequently made during the interview were voluntary or the result of psychological coercion.  A defendant is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession.  *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780 (1964);  *Lego v. Twomey*, 404 U.S. 477, 478, 92 S.Ct. 619, 621 (1972).  The prosecution is also required to prove by a preponderance of the evidence that the confession was voluntary.  *United States v. Jenkins*, 938 F.2d 934,  938 (9th Cir. 1991) states in this regard:

1
2
3
4
5

> Ordinarily, to determine the voluntariness of a confession, we consider the "totality of circumstances" surrounding it. *See, e.g., Schneckloth v. Bustamante,* 412 U.S. 218, 226-27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Thus, the question to be faced in each case is whether the defendant's will was overborne when he confessed, *Fulminante,* 111 S.Ct. at 1252 n. 2, *i.e.,* "[i]s the confession the product of an essentially free and unconstrained choice by its maker?" *Id.* at 1261 (Rehnquist, C.J., dissenting in part).

6        *See also United States v. Shi*, 525 F.3d at 728, citing *United States v. Doe*, 155 F.3d 1070,

7   1074 (9th Cir. 1998).

8        In *United States v. McShane*, 462 F.2d 5 (9th Cir. 1972), officers found firearms during a

9   search of defendant's apartment.  They arrested defendant, an ex-felon, and took him and his

10  girlfriend to the police station for questioning.  The girlfriend told the officers that she knew

11  nothing about the guns.  The girlfriend and defendant were permitted to meet out of the hearing of

12  the officers and the girlfriend allegedly asked defendant if he was going to allow her to be

13  implicated.  The defendant told one officer that he would confess if they let his girlfriend go.  The

14  officer said she could leave at any time and the defendant thereupon confessed.  He later repeated

15  the confession to another officer with the assurance that it was true and was not given just to

16  protect his girlfriend.  The defendant subsequently asserted that he confessed because he was

17  concerned for his girlfriend who was in poor health.  In holding that defendant's confession was

18  voluntary, the court noted that there was no evidence that the officers knew defendant's girlfriend

19  had any health problems or that they sought to pressure defendant by exploiting his fears.  The

20  court stated:

21
22
23
24
25
26
27

> If the officers in the case before us had expressly threatened Audrey with arrest and prosecution, or had bargained with McShane to get his confession in exchange for her release, we would have serious doubts about the admissibility of the confession. Such tactics are objectionable on two grounds. In a free society the police should not extract confessions by such psychological pressure. And we can readily imagine that the psychological coercion generated by concern for a loved one could impair a suspect's capacity for self control, making his confession involuntary. The police conduct in this case was not reprehensible, and the record does not show that McShane felt great psychological stress. So we hold that, in the limited circumstances of this case, the confession was voluntary and admissible.

28  . . .

1     *McShane*, 462 F.2d at 7-8.

2          In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the defendant was suspected of

3     having participated in a staged robbery.  After advising defendant of her *Miranda* rights, the FBI

4     agents accused her of lying about the robbery.  They explained to her the advantages of cooperating

5     with law enforcement, the crimes that she might be guilty of, and the lengthy sentence she faced if

6     convicted.  The agents also told defendant that she would not or might not see her two-year old

7     child for a while if she went to prison.  The defendant began to sob and noticeably shook.  She then

8     confessed that the robbery had been staged by her boyfriend and another individual.  In holding that

9     the defendant's confession was involuntary, the court stated:

10                      Law enforcement conduct which renders a confession involuntary
                        does not consist only of express threats so direct as to bludgeon a
11                      defendant into failure of will.  Subtle psychological coercion suffices
                        as well, and at times more effectively, to overbear "a rational intellect
12                      and free will."

13    *Tingle*, 658 F.2d at 1335.

14          The court cited *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917 (1963), which held that a

15    confession was  involuntary when it was made only after the police told the defendant that state

16    financial aid for her children would be cut-off and her children would be taken away from her if she

17    did not cooperate.  The Court noted that there was no friend or advisor present to whom the

18    defendant could turn for advice, that she had no previous experience with law enforcement and had

19    no reason not to believe that the police had the ability to carry out their threats.  *Tingle*, 658 F.2d at

20    1335.  *Tingle* distinguished *McShane* by noting that the police in that case had a legitimate reason

21    for bringing the girlfriend to the station for questioning, whereas there was no legitimate reason for

22    warning Tingle that she would not see her child again or that the agent intended to inform the

23    prosecutor that she had refused to cooperate.  The court stated that Tingle had every reason to

24    believe, from what she was told, that her confession would have a significant impact on her ability

25    to see her child.  The record, also showed that Tingle was under great psychological stress, whereas

26    the defendant in *McShane* was not.

27          The fact that coercive threats such as those in *Tingle* are made, however, does not

28    automatically render an admission or confession involuntary.  In *United States v. Patayan Soriano*,

23

1   361 F.3d 494, 502-504 (9ᵗʰ Cir. 2004), a federal postal inspector sought consent from the suspect's

2   girlfriend, who was also the mother of their two children, to search their motel room.  The woman

3   repeatedly told the officers that she was uncertain what to do.  A local police officer who was

4   standing nearby told her that if she did not sign the consent form, she might be arrested and her

5   children placed in protective custody.  The postal inspector, however, immediately advised the

6   woman that she was not a suspect, would not be arrested and that her children would not be at risk.

7   The woman continued to express her uncertainty but eventually signed the consent form about ten

8   minutes after the police officer had made his threat.  Over a strong dissent, the court affirmed the

9   district judge's decision that the consent to search was voluntarily based on the totality of the

10   circumstances, which included the postal inspector's corrective statements and the passage of

11   additional time after the police officer made the threat.

12          In this case, Defendant Coley raised the issue of his girlfriend at the beginning of the

13   interview by thanking the officers for letting her go.  Officers McMurtry and Mendoza responded

14   by telling Defendant that his girlfriend was present at the jail.  Officer McMurtry immediately

15   attempted exploit Defendant's concern for his girlfriend by telling him that "what happens to your

16   girlfriend depends on you dude ...." *Coley Statement*, p. 00249.  Defendant Coley responded to

17   Officer McMurtry's initial foray, however, by inquiring whether the officers would be willing to

18   resolve the charges against him in exchange for information about homicides and a robbery

19   committed by third persons.  When Officer McMurtry again stated he was giving Defendant an

20   opportunity to "step up to the plate" in order to spare his girlfriend, Defendant Coley responded by

21   telling the officers that  this was not his first "rodeo," i.e., involvement in criminal proceedings, and

22   that he was not going to admit to anything because he had not seen the discovery.  He again

23   attempted to shift the discussion back to his willingness to provide information about crimes

24   committed by third persons in exchange for favorable resolution of the charges against him.

25   Defendant Coley then engaged in a discussion with Officer McMurtry concerning the warrants and

26   charges against him.  Defendant responded to Officer McMurtry's accusation that the guns and

27   narcotics were found in his apartment, by denying that the apartment was his.  Defendant

28   acknowledged, however, that he sometimes paid the rent and that he had clothes in the apartment

24

which his girlfriend had washed for him.  Although Officer McMurtry continued to press Defendant Coley to confess in order to spare his girlfriend from arrest or prosecution, Defendant Coley refused to do so.

This case is distinguishable from both *McShane* and *Tingle*.  Officer McMurtry clearly attempted to extract a confession by exploiting Defendant's concern for his pregnant girlfriend. Defendant Coley, however, did not give in to Officer McMurtry's efforts at psychological coercion. Once it became clear to Defendant that the officers would not negotiate with him in exchange for information about third persons, he rejected their efforts to persuade him to confess in exchange for allowing his girlfriend to go free.  The Court has also listened to the audio recording of the interview.  Defendant's voice appeared somewhat nervous or tense at times.  Mr. Coley, however, also argued with the officers and laughed at various points during the interview in response to statements made by them.  There is no evidence that Defendant Coley became emotionally upset or exhibited great psychological stress at any time during the interview.  Based on the totality of the evidence, the Court concludes that Defendant Coley's free will was not overborne by psychological coercion.  His statements to the officers concerning the payment of rent and having clothing in the apartment were, therefore, voluntary.

## CONCLUSION

Based on the foregoing, the Court concludes that Defendant Coley's Fourth and Fifth Amendment rights were not violated.  Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#37) and his Motion to Suppress for Fourth Amendment Violation (#42) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has

25

also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 1st day of June, 2010.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge